IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

HITACHI CONSTRUCTION
MACHINERY AMERICAS INC.,

    Plaintiff,

v.

                              2:25-CV-155-Z-BV

AMARILLO MACHINERY
COMPANY,
*et al.*,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Hitachi Construction Machinery Americas Inc.'s ("Hitachi") Motion to Dismiss ("Motion"), filed September 12, 2025. ECF No. 14. Defendant Amarillo Machinery Company ("AMC") responded on October 3, 2025. ECF No. 22. Hitachi replied on October 17, 2025. ECF No. 25. The Motion is now ripe. Having reviewed the Motion, briefing, and relevant law, the Motion is **DENIED**. The Court **GRANTS** AMC leave to amend its pleadings with respect to the claims for injunctive relief.

### BACKGROUND

This case presents a common scenario: One party wishes to end a business relationship, while the other party seeks to retain it. Each claims wrongdoing by the other. Hitachi, a supplier of "construction equipment," and AMC, a dealer of such equipment in the Amarillo area, entered into a Dealer Agreement for the sale of "wheel loaders and associated parts" beginning in January of 2020. ECF No. 1 at 2–3; ECF No. 1-1 at 7; ECF No. 7 at 2. Hitachi would supply AMC with equipment. Then, AMC would sell to end-users.

The Dealer Agreement incorporated two other documents, a Sales Terms Agreement and a Security Agreement. ECF No. 1 at 3; ECF No. 7 at 2. The Dealer Agreement required,

in part, that "[AMC] will be given thirty (30) days written notice prior to the effective date of any change in the [Hitachi] Standard Sales Order Terms." ECF No. 1-1 at 9. It further required AMC to "grant to [Hitachi] a purchase money security interest in all Inventory sold to the Dealer by [Hitachi], for which [Hitachi] remains unpaid." *Id.* at 10.

By incorporating those other documents, the Dealer Agreement required compliance with them. Upon any "failure . . . to perform" an "obligation" or "covenant" in the Dealer Agreement or "related agreements," the Dealer Agreement allowed the aggrieved party to terminate the contractual relationship. *Id.* at 13. But that termination could only occur if the offending party failed to "cure such default within ten (10) days after receiving notice from the aggrieved party that sets forth such nonperformance." *Id.* Once a party received notice and failed to cure the nonperformance, nearly any breach in the parties' dealings could justify termination under the Dealer Agreement.

Against that contractual backdrop, the business relationship between Hitachi and AMC continued amicably until November 13, 2024. On that date, Hitachi alleges "AMC failed to remit payment for multiple invoices," including a $31,504.80 bill for three buckets. ECF No. 1 at 3. Hitachi claims it gave written notice to AMC on November 24, 2024, but did not receive payment until nearly two months later. *Id.* at 3–4 ("AMC did not pay the amount owing until January 21, 2025, sixty-nine (69) days after it was due, and fifty-eight (58) days after receiving notice it was past due."). *Id.* at 4. In the interim, Hitachi purported to terminate the Dealer Agreement.

Hitachi initiated the termination through a letter, which it sent to AMC on January 9, 2025. *Id.* at 5. That letter stated AMC breached the contract by failing to make timely payment on at least one invoice, even after receiving notice and a reasonable opportunity to cure. Hitachi's letter cited the late (at the time, missed) payment as the basis for termination.

2

It also alleged failures to "properly market, advertise, and sell the Products," "maintain adequate inventory levels," and "maintain adequate sales" to "satisfy market share requirements." ECF No. 7 at 12. After Hitachi sent that letter, it received a check for the amount owing on January 21, 2025. *Id.* at 4. But Hitachi received no other response to its letter. Accordingly, Hitachi sent a follow-up letter on February 10, 2025. The follow-up letter attempted to confirm the termination and invoked the Security Agreement. Hitachi gave AMC two options: (1) request that Hitachi repurchase the Collateral within thirty (30) days, or (2) remit payment for the Collateral. *See id.* at 5.

But AMC resisted termination. It rejected Hitachi's ultimatum and retained possession of the Collateral *without* expediting payment. According to AMC, it even continued to conduct business with Hitachi after the purported termination. *See id.* at 13. And Hitachi accepted the late payment on the $31,504.80 invoice. *Id.* at 12–13.

Hitachi eventually sued AMC and its guarantor, D.E. Rice Construction Company, claiming breach of contract and requesting a writ of sequestration.[1] *See* ECF No. 1. AMC responded with counterclaims for "violation of the Texas Fair Practices of Equipment Manufacturers, Distributors, Wholesalers[,] and Dealers Act" ("Dealers Act") and breach of contract. *See* ECF No. 7. Specifically, AMC sued for (1) damages under the Dealers Act, (2) injunctive relief under the Dealers Act, and (3) three separate counts for breach of contract, each requesting injunctive and monetary relief. *See id.*

Hitachi then filed the instant Motion to dismiss all of AMC's counterclaims for failure to state a claim. ECF No. 14.

---

[1] The Court granted Hitachi's application for the writ on May 18, 2026. ECF No. 35.

LEGAL STANDARD

Surviving a motion to dismiss requires little from a claimant. The Supreme Court has instructed that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" such that it "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). This is a relatively low bar. A claimant need not provide "detailed factual allegations." *Id.* But the complaint must allege more than "labels and conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level," assuming "that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

When a court finds—accepting well-pleaded facts as true—that a claim to relief is "plausible on its face," the suit should proceed. *Id.* at 570. Plausibility depends on the Court's ability to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This standard applies equally to counterclaims. *See* FED. R. CIV. P. 8(a) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."); 5 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1205 (3d ed. 2013) ("Rule 8(a) applies . . . to a pleading containing a claim for relief that takes the form of a counterclaim, cross-claim, or third-party claim."); *Pharma Funding LLC v. Verde Pharmacy & Med. Supply LLC*, No. 3:20-CV-1731, 2022 WL 837949, at *3 (N.D. Tex. Jan. 28, 2022) ("[T]he *Twombly* and *Iqbal* plausibility standard applies to pleading any 'claim for relief' under Rule 8(a)'s

4

requirements—whether as a plaintiff's claim or a defendant's counterclaim."). The Court now applies that standard to AMC's counterclaims.

### ANALYSIS

### I. Dealers Act Claims

AMC's first two claims allege Hitachi violated the Dealers Act by terminating the Dealer Agreement without "good cause." ECF No. 7 at 14. The Dealers Act is a Texas law regulating contractual relationships between suppliers and dealers of covered equipment. *See* TEX. BUS. & COM. CODE §§ 57.001–57.402. The Act is generally protective of Texas dealers, who frequently wield less bargaining power than their suppliers. *See Fire Prot. Serv., Inc. v. Survivitec Survival Prods., Inc.*, 153 F.4th 439, 444 (5th Cir. 2025). Relevant here, "[t]he Act forbids suppliers from terminating dealer agreements concerning 'Equipment' without good cause and imposes an obligation on suppliers to repurchase unsold inventory upon termination." *Id.* Of course, for these claims to survive Hitachi's Motion, the Texas law they rely on must first apply.

### *A. Choice of Law*

Here, Texas law determines which substantive law applies. "Because this is a diversity case, the forum state of Texas provides the law that governs this choice-of-law analysis."[2] *Cardoni v. Prosperity Bank*, 805 F.3d 573, 580 (5th Cir. 2015); *see also Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004) ("District courts sitting in diversity apply the choice-of-law rules of the forum state.").

---

[2] Though neither party raised the issue in briefing the Motion, the Court must assure itself of jurisdiction. Hitachi's complaint adequately pled facts invoking this Court's diversity jurisdiction. *See* 28 U.S.C. § 1332. Hitachi and AMC are citizens of different states, Georgia and Texas, respectively. ECF No. 1 at 1. The amount in controversy exceeds $75,000, as Hitachi seeks the satisfaction of an alleged $3,011,581.87 debt. *Id.* at 7. AMC's counterclaims arise from a "common nucleus of operative fact," namely the purported termination of the Dealer Agreement, and therefore satisfy the Court's supplemental jurisdiction. *See* ECF No. 7 at 14–22; 28 U.S.C. § 1367(a); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

"In Texas, contractual choice-of-law provisions are typically enforced." *ECM Corp.*, 393 F.3d at 597. But that general rule has limits. For example, "[t]he state's law specified by the choice-of-law clause is applied *only* to those claims pertaining to the instrument. All other claims are governed by the forum state's law." *Id.* (emphasis added). And, even where the claim pertains to the instrument, "[c]ontractual choice-of-law provisions are not enforced in Texas if the law of the chosen state violates a fundamental public policy of Texas." *Id.* So, where a choice-of-law clause exists, the relevant inquiry is twofold: First, does the claim pertain to the instrument? Second, does that clause violate a fundamental public policy of Texas?

Here, those questions might offer conflicting answers. First, all of AMC's claims implicate the Dealer Agreement (and other agreements incorporated therein). And that agreement selects Georgia law to govern contractual disputes. *See* ECF No. 1 at 3. But AMC's claims under the Dealers Act do not strictly rely on the Dealer Agreement's provisions. Rather, those claims explicitly invoke the greater protection afforded by the Dealers Act in lieu of the Dealer Agreement's terms. So how deeply those claims *pertain* to the instrument becomes a more difficult question. Meanwhile, Texas's strong interest in protecting in-state dealers is reflected by the Dealers Act. The Act even purports to defeat contrary choice-of-law clauses in covered agreements. TEX. BUS. & COM. CODE § 57.051. That interest might constitute a fundamental public policy which the application of Georgia law would frustrate.

But, whatever the ultimate answers to those questions, both parties concede the issue and assert that Texas law applies. While ultimately a legal question, "choice of law issues can be waived if not properly invoked." *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 473 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *see also Gen. Chem. Corp. v. De La Lastra*, 852 S.W. 2d 916, 919 (Tex. 1993) ("[T]he issue squarely before us is whether maritime

law, although properly invoked, can be waived. We conclude that it can."); *Traina v. Hargrove & Assocs., Inc.*, 651 S.W. 3d 36, 38 n.3 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (applying Texas law because "while the employment agreement states it is governed by Alabama law, no party argue[d] on appeal that Alabama law applies"). Indeed, Texas courts presumptively apply Texas law if no party seeks to enforce a foreign jurisdiction's laws. *See Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 720 (Tex. App.—Dallas 2004, no pet.) ("[A] preliminary motion must be filed asking the court to apply another state's laws . . . . Absent a motion by a party, the law of Texas may be applied to a dispute.").

Here, both parties invoke Texas law. ECF No. 1 at 3; ECF No. 7 at 14, 17, 19. Neither party seeks to enforce the Dealer Agreement's choice-of-law clause. The Court proceeds accordingly and applies Texas law to adjudicate the Motion. Because Texas law applies, so does the Dealers Act.

### B. Damages Under the Dealers Act

AMC's first counterclaim seeks damages under the Dealers Act. A successful Dealers Act claim requires four elements: (1) there was a covered dealer agreement; (2) that agreement was terminated; (3) termination occurred without good cause; and (4) damages resulted. Hitachi argues that AMC has not alleged sufficient facts to state a claim for relief.

Hitachi concedes there was a Dealer Agreement covered by the Dealers Act. ECF No. 1 at 3. Hitachi also concedes that the Dealer Agreement was terminated. *See id.* at 5. That leaves lack of good cause and damages. The Court addresses each in turn.

Under the Dealers Act, "[a] supplier may not terminate a dealer agreement without good cause." TEX BUS. & COM. CODE § 57.153. The statute limits "good cause" to twelve scenarios. *See id.* § 57.154(a). Relevant here, "good cause" exists if

> the dealer fails to substantially comply with essential and reasonable requirements imposed on the dealer under the terms of the dealer agreement,

> provided that such requirements are not different from requirements imposed on other similarly situated dealers either by their terms or by the manner in which they are enforced.

*Id.* § 57.154(a)(1). A supplier also has "good cause" to terminate the agreement if "the dealer has defaulted under the terms of any chattel mortgage or other security agreement between the dealer and the supplier." *Id.* § 57.154(a)(7). Finally, good cause exists if "the dealer has consistently failed to meet and maintain the supplier's requirements for reasonable standards and performance objectives, so long as the supplier has provided the dealer with reasonable standards and performance objectives based on the supplier's experience in other comparable market areas." *Id.* § 57.154(a)(12).

To summarize the relevant examples, good cause exists when the dealer (1) substantially failed to comply with reasonable requirements under the agreement, (2) defaulted under a security agreement, or (3) consistently failed to meet a supplier's requirements. Hitachi claims all three justified its termination attempt. AMC responds that Hitachi's justifications are baseless and pretextual. Hitachi's Motion argues that AMC has failed to state a claim because it insufficiently pleads facts supporting a lack of good cause for terminating the Dealer Agreement. But AMC's well-pleaded facts must be presumed true at this stage. And it has alleged facts to counter each of Hitachi's bases for termination.

First, the missed payment—AMC alleges that payment was paid on time. According to AMC, the "underlying contracts and sales terms . . . provided zero percent interest for 12 months and would not mature until after 12 months." ECF No. 7 at 8. It further alleges Hitachi's invoice INV0498448 ($31,504.80 for three buckets) "deviated from its standard 360-day terms used in previous bucket purchases without notice." *Id.* at 12. The invoice reflected a purchase made less than one year from the date of Hitachi's attempt to terminate the Dealer Agreement. Under the standard terms, the payment was not yet due. Because no

payment was due, AMC never defaulted under the Security Agreement. Without a default, the Security Agreement could not justify terminating the Dealer Agreement.

AMC also alleges it "promptly paid the amount owed" after Hitachi "raised the issue of the changed terms" and that "such cure was accepted by [Hitachi]." *Id.* at 13, 16. Hitachi even admits that AMC paid the invoice. The question becomes when adequate notice was given. AMC claims did not receive proper notice until January 14, when it received Hitachi's Notice of Termination. *Id.* at 12–13. Even Hitachi's pleadings indicate it received payment on that invoice by check. An attached exhibit shows a check dated January 6, 2025, and received by January 21, 2025. So even compared to Hitachi's pleadings, AMC's account is plausible and the Court must accept it as true for purposes of the Motion. As such, AMC has adequately pled the lack of any default under the Security Agreement.

Next, AMC alleges it "substantially complied with the essential and reasonable terms of the Dealer Agreement." In support, AMC alleges Hitachi never "claim[ed] any defaults prior to serving the Notice of Termination," and that AMC "has been profitable in selling and servicing [Hitachi's] requests," contrary to Hitachi's allegations of sales and market share deficiencies. *Id.* at 13. AMC rejects Hitachi's inventory complaints, instead asserting that Hitachi "never set any required inventory level," but instead "consistently failed to timely deliver inventory requested by AMC." *Id.* at 12. Since AMC is hardly required to prove a negative at this stage, these allegations suffice.

Having denied Hitachi's stated reasons for termination, AMC alleges a hidden motive. AMC claims "[t]he alleged defaults are pretext for the real reason for termination of the Dealer Agreement—AMC is a small dealer only allowed by [Hitachi] to sell wheel loaders which does not align with [Hitachi's] desired future business model." *Id.* at 13. AMC supports this claim by alleging Hitachi recently appointed "ASCO, a large dealer organization with

multiple locations in Texas, including one in Amarillo, to become a dealer of all of Hitachi's Products." *Id.* at 11. And, "in the fall of 2024" a representative of Hitachi "admitted that it had no basis to terminate AMC, but nevertheless planned to terminate AMC as soon as they could." *Id.* That representative also "threatened AMC with retaliation in the form of reducing AMC's territory and/or limiting opportunities to sell/obtain inventory if AMC did not voluntarily terminate the Dealer Agreement." *Id.*

Taken together, AMC has alleged facts rebutting Hitachi's proper termination of the Dealer Agreement and even alleged facts supporting an alternative, impermissible reason. Even if certain elements of AMC's account lack crystalline clarity, AMC has at least pled facts that, taken as true, plausibly infer Hitachi lacked "good cause" for termination.

Finally, AMC has adequately pled damages. AMC claims it "will suffer lost profits and other monetary damages" as a result of Hitachi's allegedly wrongful termination. *Id.* at 17. Elsewhere, AMC notes that it "has been profitable in selling [Hitachi's] products," but recently Hitachi "advised AMC that it would not be fulfilling further orders from AMC." *Id.* at 12, 14. Because lost profits can reasonably be inferred from the termination of a profitable business relationship, AMC has plausibly alleged those damages. AMC's asserted costs also include costs incurred litigating Hitachi's suit, as allowed under the Dealers Act. *See* TEX. BUS. & COM. CODE § 57.401. While AMC's pleading of damages is thin, it suffices at this early stage.

Having alleged facts supporting each of the elements for a violation of the Dealers Act, AMC has stated a claim for relief that is "plausible on its face." And so it survives Hitachi's Motion.

## C. Injunctive Relief Under the Dealers Act

AMC's second counterclaim seeks injunctive relief under the Dealers Act. The Act permits "injunctive relief for unlawful termination," but does not articulate a standard for granting those injunctions. TEX. BUS. & COM. CODE § 57.401. AMC alleges entitlement to such relief by incorporating its previous allegations and asserting Hitachi's actions "will cause irreparable harm to AMC." ECF No. 7 at 18. AMC's assertion of "irreparable harm" is conclusory. But in lieu of dismissal, the Court **GRANTS** AMC's request for leave to amend its pleadings.

The Dealers Act's silence on the standard for injunctive relief presumptively imports the traditional standard. Even statutorily authorized injunctions invoke the Court's "equitable discretion." *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006) (applying traditional injunction standards to relief under the Patent Act). "It goes without saying that an injunction is an equitable remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). And because an injunction "is not a remedy which issues as of course," statutes prescribing equitable relief are presumed to import the traditional, equitable standards for obtaining such relief. *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–38 (1933). That presumption reflects what a reasonably informed reader would intuit: that "a major departure from the long tradition of equity practice should not be lightly implied." *eBay Inc.*, 547 U.S. at 391 (quoting *Weinberger*, 456 U.S. at 320). Without a clear indication to the contrary, the best reading of the Dealers Act's injunction provision is that it incorporates the "established principles" of equity, of which lawmakers—and reasonably savvy readers—are "assuredly well aware." *Weinberger*, 456 U.S. at 313.

Since the statute invokes the Judiciary's equity powers, the Court must exercise that authority in accordance with traditional requirements. As the Supreme Court instructs,

11

> [a]ccording to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc.*, 547 U.S. at 391. These four requirements are prerequisites for obtaining an injunction.[3] Thus, a litigant seeking an injunction must plausibly allege an irreparable injury. *See Starrett v. City of Richardson*, No. 3:18-CV-191, 2018 WL 4627133, at \*15 (N.D. Tex. July 27, 2018) ("Plaintiff's request for permanent injunctive relief fails for similar reasons as his request for preliminary injunctive relief: his conclusory and speculative allegations fail to show the existence of a wrongful act or the existence of imminent harm or irreparable injury."). *Cf., e.g., Jackson v. Fed. Home Loan Mortg. Corp.*, No. 4:11-CV-507, 2011 WL 3874860, at \*3 (N.D. Tex. Sept. 1, 2011) (dismissing injunctive claim where movant could no longer plausibly allege one of the requirements: likelihood of success on the merits); *Bennett v. JPMorgan Chase*, No. 3:12-CV-212, 2012 WL 2864751, at \*5 (N.D. Tex. June 12, 2012) (same).

---

[3] Temporary relief requires a similar showing. A *preliminary* injunction may issue when a movant shows the following:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Here, AMC indicates it might move for preliminary injunctive relief in the future. But it has not yet done so. *See* ECF No. 7 at 18 ("AMC further asks that the Court enter preliminary injunctive relief upon application by AMC to become final after a trial on the merits."). Still, AMC must plausibly allege irreparable injury—even at the preliminary stage. And Texas law would require the same. *See Livingston v. Livingston*, 537 S.W.3d 578, 587 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("To obtain permanent-injunctive relief, a party must show . . . the existence of irreparable injury . . . ."). So, if the Dealers Act were instead read to incorporate the traditional standards for equitable relief *in Texas*, the statute would still require irreparable injury.

Lost profits and other monetary costs generally do not constitute irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). Those injuries are easily repaired by an award of monetary damages. Only when "the potential economic loss is so great as to threaten the existence of the movant's business" can lost profits constitute an irreparable injury. *Jiao v. Xu*, 28 F.4th 591 (5th Cir. 2022) (quoting *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989)). Since AMC does not allege its economic injuries rise to that level, it does not adequately state a claim for injunctive relief.

Despite AMC's lapse, the Court finds dismissal without an opportunity to amend would be too harsh a result, especially where AMC might cure the defect by pleading the *extent* of its incurred or anticipated injuries with greater specificity. *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case . . . ."). And AMC has requested leave to amend its pleadings. ECF No. 22 at 23. The Court therefore **GRANTS** AMC leave to amend with respect to its claim for injunctive relief under the Dealers Act.

### D. Breach of Contract: Monetary Relief

AMC's final three claims allege breaches of contract by Hitachi. In Texas, breach of contract has four elements: (1) there was a valid contract; (2) the claimant rendered or tendered performance; (3) the other party breached the contract; and (4) that breach caused damages to the claimant. *See, e.g., Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 625 (Tex. App.—Dallas 2020, no pet.). For all three claims, AMC has met the low threshold for pleading a plausible right to relief.

### 1. Claim for Sale of Excavators

First, AMC alleges Hitachi breached the parties' contract by failing to allow AMC to sell excavators. In support of that claim, AMC avers the Dealer Agreement entitled AMC "to carry/sell the entire line of Hitachi products." ECF No. 7 at 19. In other words, AMC alleges there was a valid contract giving AMC a right to sell Hitachi's excavators. AMC claims it performed under the Dealer Agreement. *See id.* at 11 ("[Hitachi] admitted it had no basis to terminate AMC . . . ."); *id.* at 13 ("AMC has been profitable in selling and servicing [Hitachi's] products."). It claims Hitachi breached the agreement by refusing "to offer to sell, or sell, Hitachi excavators and associated parts" since 2022. *Id.* at 19. Finally, AMC alleges that breach caused damages, "in the form of lost profits on sales of Hitachi excavators" and related services." *Id.* All four elements of breach of contract have been adequately, if not artfully, pled. Even if AMC's ultimate success on this claim appears doubtful, it is at least "plausible on its face" and therefore entitled to proceed. *See Twombly*, 550 U.S. at 570.

### 2. Claim for Wrongful Termination

Second, AMC alleges Hitachi's termination breached the Dealer Agreement. According to AMC, the Dealer Agreement required notice and an opportunity to cure defaults. ECF No. 7 at 20. But AMC asserts it received no notice of a default prior to the termination notice. AMC further claims (1) there was no default and (2) any possible default was cured by AMC's payment within ten days of receiving adequate notice. *Id.* at 20. AMC therefore alleges that it performed under the contract. In spite of AMC's purported performance or cured default, Hitachi terminated the agreement, thereby breaching the same. AMC alleges lost profits "stemming from [Hitachi's] termination" of the Dealer Agreement. *Id.* Again, all four elements have been pled "above the speculative level." *Twombly*, 550 U.S. at 555.

14

### 3. Claim for Second Wrongful Termination

Finally, AMC claims Hitachi's final termination letter breached a *separate* agreement. Specifically, AMC claims the two parties resumed dealings "between January 13, 2025 and March 31, 2025." ECF No. 7 at 21. During that time, AMC made "multiple purchases" with "sales terms . . . for 0% interest for twelve months with the debt not maturing/coming due until the twelfth month after purchase." *Id.* These dealings constituted a separate contractual relationship, under which AMC fully performed. AMC alleges Hitachi breached this later agreement by terminating it and demanding premature payment of inventory purchased "after the purported termination of the Dealer Agreement." *Id.* AMC pleads damages in the form of early payment, wrongfully claimed interest, and "potential loss of possession of the inventory subject to the [later] contracts." *Id.* Again, AMC's pleadings, though scant, plead sufficient facts for each element.

### e. Breach of Contract: Injunctive Relief

AMC's breach of contract claims in Counts four and five also request injunctive relief. As previously noted, injunctive relief requires a claimant to show irreparable harm. But AMC has merely alleged financial injuries. Nowhere does AMC plead harm that would rise above the general rule: lost profits and other monetary costs do not constitute irreparable harm. *See Sampson*, 415 U.S. at 90. For the same reasons given in the Court's assessment of AMC's injunctive claim under the Dealer Act, the Court **GRANTS** AMC leave to amend its pleadings with respect to damages in Counts four and five.

### CONCLUSION

For the reasons stated, AMC has stated a claim for four of its five counts. For most of those claims, the lynchpin is the $31,504.80 missed payment—whether or not its untimeliness justified termination. AMC adequately pleads facts disputing the validity of that payment's due date and ultimate satisfaction.

15

With respect to AMC's claims for injunctive relief, allowing an opportunity to amend the pleadings will better serve the interests of justice than outright dismissal. Accordingly, the Court **DENIES** the Motion (ECF No. 14) and **GRANTS** AMC leave to amend its pleadings specific to injunctive relief. AMC must file any amendment within fourteen (14) days of this Order.

**SO ORDERED**.

June 17, 2026

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

16